WOODSON (LETCHER v.). See Case No. 8,280.

WOODSON (MURDOCK v.). See Case No. 9,942.

## Case No. 17,998.

### WOODSUM v. BRAY et al.

[5 Sawy. 133.] [1]

District Court, D. California. April 2, 1878.

#### PREFERENCE BY BANKRUPT.

A bill of sale by the bankrupt *held*, under the circumstances, to be a preference.

[This was an action by C. A. Woodsum, assignee in bankruptcy, against Frank Bray and Isaac N. Thompson.]

J. A. Yoel and D. L. Delmas, for plaintiff. Moore, Lane & Leib, for defendants.

HOFFMAN, District Judge. This action is brought by the assignee of the bankrupt to recover the value of certain property conveyed by the latter to the defendants in fraud of the bankrupt act [of 1867 (14 Stat. 517)].

The facts of the case are as follows: In the latter part of the year 1875 the several creditors of the bankrupt, having attached his property, he convened a meeting of his creditors to effect a settlement. They agreed to accept a payment of sixty-six and two-thirds per cent., in full satisfaction of their claims. The requisite funds were advanced by the defendants, who received from the bankrupt an absolute conveyance, intended as a mortgage, of his farm, already mortgaged for five thousand dollars. He appears at this time to have been indebted to the defendants in about four thousand dollars. He was also indebted to Woodsum, the present plaintiff, and to other creditors, to an amount somewhat over three thousand dollars. In 1877, it appears that another meeting of the creditors was held at the store of the defendants. The bankrupt testifies that Mr. Bray told him that he had heard he was getting into trouble, and that he had better call his creditors together, and they (defendants) would pay them. This proposition was accepted by the bankrupt and he thereupon gave them the security they demanded, viz. an assignment of a lease

of the Martinez farm, and conveyance of his farming implements. He afterwards consigned to them the produce of the Martinez farm. The bankrupt swears that he never afterwards had the ready money to pay, and that they certainly knew the state of his affairs. About the last of July, 1877, the bankrupt again applied to Bray for money "to finish up his crop." Bray demanded more security which the bankrupt objected to giving, on the ground that if he gave them a bill of sale for the Martinez crop others would sue him "and the whole thing would be thrown into law." Bray then offered to deduct one thousand dollars from the amount of his claim if the bankrupt could raise five thousand dollars to pay the balance. Shortly afterwards the defendants obtained the bill of sale for the property which it is sought to recover in this action. It included all the property of the bankrupt not even excepting some articles exempt from execution. It was exacted of the bankrupt, as he states under the threat, that they would otherwise "throw the thing into bankruptcy at that time." "The bill of sale was made to cover everything I might possibly have."

The bankrupt also testifies that he refused to execute this bill of sale unless the defendants agreed to pay off his Mayfield debts, amounting to about twelve hundred dollars, to which they finally assented; whether they also agreed to pay off his Santa Clara debts, he is unable to say.

The account of the transaction given by Mr. Bray substantially agrees with that of the bankrupt. Among the reasons assigned by Mr. Bray for exacting the bill of sale from the bankrupt was the fact that Manning owed debts about Mayfield and Santa Clara, and he feared the creditors might attach and cause loss to the estate; that he expected a rise in the price of wheat and he desired to get Manning's crop into his hands to save it from attachments, and to hold for the expected rise. He also stated as an additional reason that he feared the bankrupt was becoming intemperate, and might cause him a loss through mismanagement. He differs from the bankrupt, however, in one particular; but the difference is certainly to his disadvantage. He states that he agreed with the bankrupt that if the crop produced six thousand dollars, they would defer their claim to the amount of one thousand dollars, and would pay the Mayfield creditors; but those creditors were to be paid only in case the crop produced that sum.

Mr. Thompson, his partner, makes the same statement: "My understanding was that if the crop, farming utensils, horses, etc., produced six thousand dollars, we were to pay the creditors one thousand two hundred dollars."

Antonio Martinez, who was present when the bill of sale was executed, testified that he told Bray that he had a bill against the

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

bankrupt, and inquired if he thought he could collect it; to which Bray replied that he did not know. Martinez then said that he thought that Manning was about to be attached. Bray answered that he thought so too, and that he had come there to provide against it by making him sign a bill of sale.

The above are all the facts it is deemed necessary to mention. A clearer case of an illegal preference could hardly be presented. That the bankrupt was hopelessly insolvent cannot be disputed; and that the defendants had reasonable cause to believe him so is equally plain. Mr. Bray swears that he believed him to be solvent; that is, that if his crops turned out well, and if his farm could be sold for a considerable sum in excess of the mortgage (which, under the testimony, seems to have been highly improbable), and if his horses, farming implements, etc., brought fair prices, enough might have been obtained to satisfy all the indebtedness which Mr. Bray supposed he owed.

It is unnecessary to dwell upon the fact, that even if there had been more grounds for this conjecture or estimate than appear to have existed, the condition of the bankrupt would nevertheless have been, in legal contemplation, that of insolvency. He was certainly then, and for a long time previously had been, unable to pay his debts. From the time that the defendants had advanced the funds to enable him to settle with his creditors at sixty-six and two thirds cents on the dollar, his indebtedness then had been constantly increasing. They had taken from him a deed for his farm, an assignment of his lease, and even of a policy of insurance on his life for one thousand dollars. He had also placed in their hands a large quantity of grain, and they had obtained from him a bill of sale of his horses, farming implements, etc., the possession of which does not appear to have been transferred.

Shortly before obtaining the bill of sale in question in this suit, they had offered to reduce their claim by one thousand dollars, provided he could obtain five thousand dollars to pay them; and when the bill was executed it was insisted on with the full knowledge and for the avowed reason that attachments by other creditors were impending. They were not aware, it is true, of the debt to Woodsum, amounting to some three thousand dollars, but they knew there were debts due to creditors in Mayfield and Santa Clara, and these they, according to their own statement, agreed to pay to the amount of one thousand two hundred dollars (although the bankrupt demanded one thousand five hundred dollars) only in case the crop and other property produced six thousand dollars, a condition wholly inconsistent with a belief in the solvency of a man whom they were compelling to convey all the property he possessed, of every kind and description, including some articles exempt by law from execution.

Their own avowal, that their reason for demanding the transfer was to save the property from attachments which were about to be levied, is a confession that they intended to make the bankrupt put the whole of his property beyond the reach of his other creditors, and to secure for themselves the means of appropriating it exclusively to the satisfaction of the debt due them. It is precisely such transactions that the provisions of the bankrupt act, with respect to preferences, were intended to prohibit and avoid. Of the property conveyed to the defendants, only the wheat and the spring wagon appear to have come into their possession, or to have been retained by them. The quantity of wheat seems to have been in all, ninety-eight thousand and seventy-four pounds, which at two dollars and seventy-five cents per cental, amounts to two thousand six hundred and ninety-seven dollars and three cents; spring wagon, two hundred and thirty dollars, making two thousand nine hundred and twenty-seven dollars and three cents.

I have taken these figures from the brief of the counsel for the plaintiff. Their accuracy is not controverted in the brief filed on the part of the defendant. If any error in them can be pointed out it will be corrected. But if no suggestion to that effect be made, judgment for the sum of two thousand nine hundred and twenty-seven dollars and three cents. in gold coin, will be entered.

Some conversation occurred at the hearing with regard to expenses incurred by the defendants after the execution of the bill of sale in preparing the wheat for market. No mention is made of this in the brief of the defendants. If any such expenses as for threshing, sacking. hauling, etc., were incurred, they should be allowed so far as they contributed to enhance the value of the property conveyed to them.